1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

* * *

INTERNATIONAL BROTHERHOOD
OF TEAMSTERS, AIRLINES DIVISION;
AIRLINE PROFESSIONALS
ASSOCIATION OF THE IBT, LOCAL
UNION NO. 1224,

               Plaintiffs,

   v.

ALLEGIANT AIR, LLC; ALLEGIANT
TRAVEL COMPANY,

               Defendants.

Case No. 2:14-cv-00043-APG-GWF

**ORDER GRANTING MOTION FOR
PRELIMINARY INJUNCTION**

(Dkt. No. 51)

## I.      BACKGROUND

In November 2013, Plaintiffs International Brotherhood of Teamsters, Airlines Division

and Airline Professionals Association of the IBT, Local Union No. 1224 (collectively, the "IBT"

or "Union") sued defendants Allegiant Air, LLC and Allegiant Travel Company (collectively,

"Allegiant") in federal court[1] under the Railway Labor Act ("RLA").[2]  The IBT seeks to restore

the status quo working conditions that existed before August 2012, when both the National

Mediation Board ("NMB") certified the IBT as the Allegiant pilots' exclusive bargaining

representative and the IBT filed a notice of its intention to negotiate a new collective bargaining

agreement ("CBA") under RLA § 6 (45 U.S.C. § 156).

The IBT alleges that, before its certification by the NMB, an independent organization

called the Allegiant Air Pilots Advocacy Group ("AAPAG") represented the pilots for purposes

of the RLA.  AAPAG negotiated and executed a series of "Pilot Work Rules" agreements with

---

[1] This case was initially filed in the U.S. District Court for the Southern District of Florida.  On
January 8, 2014, the case was transferred to this Court. (Dkt. No. 33.)

[2] 45 U.S.C. §§ 151–188.

1   Allegiant, most notably in June 2009[3] and May 2010.[4]  The parties refer to the latter as the 2010

2   Pilot Work Rules Agreement ("PWR"), and it is the most recent agreement between Allegiant and

3   the pilots.  The IBT contends that, after it filed its RLA § 6 notice, Allegiant unilaterally changed

4   some of the rules contained in the PWR.  According to the IBT, this violated the RLA's status

5   quo protections.

6        The IBT opposes four changes in work conditions: (1) altering the Loss of Medical

7   Certificate Protection program for pilots who become ill or disabled; (2) eliminating pay

8   protections for pilots engaged in collective bargaining negotiations; (3) changing the leave of

9   absence provisions for birth and adoption such that a pilot now receives five calendar days off

10  following the arrival of a new child (regardless of how many days of work were scheduled in

11  those five days) instead of five working days off with no restriction on when they are to be taken;

12  and (4) replacing line bidding for pilot scheduling with a preferential bidding system ("PBS").[5]

13  Further detail on these changes is provided below as necessary.

14       The Complaint asserts six claims for relief—five under the RLA and one for breach of

15  contract.  The first claim is based on RLA § 6 (45 U.S.C. § 156), which provides:

16       Carriers and representatives of the employees shall give at least 30 days' written
         notice of an intended change in agreements affecting rates of pay, rules or working
17       conditions, and the time and place for the beginning of conference between the
         representatives of the parties interested in such intended changes shall be agreed
18       upon. . . .  In every case where such notice of intended change has been given, . . .
         rates of pay, rules and working conditions shall not be altered by the carrier until
19       the controversy has been finally acted upon . . . by the Mediation Board, unless a
         period of ten days has elapsed after termination of conferences without request for
20       or proffer of the services of the Mediation Board.

21
    In short, RLA § 6 prohibits carriers from altering rates of pay, rules, and working conditions
22
    unless the carrier provides express notice of its intent to change the current "agreement" and
23
    engages in bargaining during the amenable period set forth by the parties.  The IBT contends that
24

25  ───────────────

26       [3] (2009 Pilot Work Rules, Dkt. No. 59-3.)

         [4] (2010 Pilot Work Rules ("PWR"), Dkt. No. 51-5 at 8–58.)

27       [5] A fifth challenge, to the system-wide displacement of pilots upon Allegiant's acquisition of a
    new aircraft type, has been rendered moot.
28

1  Allegiant's unilateral changes to the status quo working conditions constitute ongoing violations

2  of RLA § 6 because Allegiant did not provide express notice of those changes or engage in

3  bargaining with the IBT as to those changes.

4       In related fashion, RLA § 2, Seventh (45 U.S.C. § 152, Seventh) provides that "[n]o

5  carrier, its officers, or agents shall change the rates of pay, rules or working conditions of its

6  employees, as a class, as embodied in agreements except in the manner prescribed in such

7  agreements or in section 156 of this title [RLA § 6]." The IBT asserts that Allegiant violated

8  RLA § 2, Seventh by unilaterally changing the working conditions during the ongoing collective

9  bargaining negotiations without complying with RLA § 6.

10      As to the next claim, RLA § 2, First (45 U.S.C. § 152, First) provides:
        It shall be the duty of all carriers, their officers, agents, and employees to exert
11      every reasonable effort to make and maintain agreements concerning rates of pay,
        rules, and working conditions, and to settle all disputes, whether arising out of the
12      application of such agreements or otherwise, in order to avoid any interruption to
        commerce or to the operation of any carrier growing out of any dispute between
13      the carrier and the employees thereof.

14

15  Concerning this RLA section, the IBT contends that Allegiant's unilateral work rules changes

16  demonstrate that Allegiant has not exerted every reasonable effort to maintain the PWR. IBT also

17  contends that Allegiant has not exerted every reasonable effort to settle the disputes related to

18  these work rules changes with IBT.

19      The IBT's fourth RLA claim is based on § 2, Fourth (45 U.S.C. § 152, Fourth), which

20  provides in relevant part:

21      Employees shall have the right to organize and bargain collectively through
        representatives of their own choosing. . . . No carrier . . . shall deny or in any way
22      question the right of its employees to join, organize, or assist in organizing the
        labor organization of their choice, and it shall be unlawful for any carrier to
23      interfere in any way with the organization of its employees, . . . or to influence or
        coerce employees in an effort to induce them to join or remain or not to join or
24      remain members of any labor organization. . . .

25  The IBT contends that Allegiant's unilateral changes to the status quo working conditions during

26  negotiations for a new CBA violate this section because Allegiant's actions are "intended and

27  designed to interfere with and discourage the Allegiant pilot's right to join and remain members

28

of a labor organization of their own choosing."[6]  Essentially, the IBT asserts that the work rules changes undermine its bargaining power in the eyes of the pilots and lower the starting point for the negotiations; for the pilots to get what they believe they deserve will require more movement from Allegiant if the baseline work conditions are lowered.

The IBT's final RLA claim asserts a violation of § 204 (45 U.S.C. 184), which provides in relevant part:

> It shall be the duty of every carrier and of its employees, acting through their representatives, . . . to establish a board of adjustment of jurisdiction not exceeding the jurisdiction which may be lawfully exercised by system, group, or regional boards of adjustment, under the authority of section 153 of this title.

The IBT alleges that Allegiant violated this section by failing to establish a system board of adjustment in its work rules agreements with AAPAG.  The breach of contract claim deserves no further explanation at this point.

The IBT moved for a preliminary injunction to restore the status quo under the PWR as of August 24, 2012—the date of the IBT's RLA § 6 notice.[7]  To resolve this motion, I must determine (1) whether this Court has subject matter jurisdiction to enjoin Allegiant's alterations of the status quo; (2) whether AAPAG was the pilots' "representative" for purposes of the RLA; (3) whether the PWR is a binding "agreement" under the RLA; and (4) whether an injunction is warranted under the applicable legal standard, and, if so, the proper scope of the injunction.  The answer to each of these questions is "yes."

---

[6] (Compl., Dkt. No. 1 ¶ 32.)

[7] (Pl.'s Mot. for Prelim. Inj., Dkt. No. 51.)

1 | **II.**   **ANALYSIS**

2 |     **A.**   **Subject Matter Jurisdiction**

3 |         **1.**   **Representation Disputes**

4 |         Federal district courts do not have subject matter jurisdiction to resolve so-called

5 | "representation disputes," which "involve determining the collective bargaining representative of

6 | the employees and the proper bargaining unit, craft, or class of employees to be represented."[8]

7 | RLA § 2, Ninth (45 U.S.C. § 152, Ninth) places these disputes within the sole jurisdiction of the

8 | National Mediation Board ("NMB").[9]  In this regard, the NMB's narrow role is to certify a

9 | bargaining representative.  The Supreme Court has held that "[t]he Mediation Board makes no

10 | 'order.'  And its only ultimate finding of fact is the certificate" of representation.[10]  This

11 | certificate identifies the "individuals or organizations that have been designated and authorized to

12 | represent the employees involved in the [representation] dispute."[11]   As put by the Ninth Circuit,

13 | "so long as the Board is acting with the purpose of 'find[ing] the fact' as to who is the employees'

14 | representative, the courts are deprived of jurisdiction to review Board decisions."[12]

15 |

16 |

17 |

18 |         [8] *IBTCWHA, Local Union No. 2707 v. Western Air Lines*, 813 F.2d 1359, 1362 (9th Cir. 1987)

19 | (per curiam), *vacated on other grounds by Delta Air Lines, Inc. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Airline Div.*, 484 U.S. 806, 806 (1987).

20 |         [9] *Gen. Comm. of Adjustment of Bhd. of Locomotive Eng'rs for Missouri-Kansas-Texas R.R. v. Missouri-Kansas-Texas R.R. Co.*, 320 U.S. 323, 336 (1943).  The relevant text of RLA § 2, Ninth

21 | provides:

22 |         If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this

23 | chapter [U.S. Code, Title 45, Chapter 8 (Railway Labor)], it shall be the duty of the [National] Mediation Board, upon request of either party to the dispute, to investigate such

24 | dispute and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that have

25 | been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier. . . .

26 |         [10] *Switchmen's Union of N. Am. v. Nat'l Mediation Bd.*, 320 U.S. 297, 304 (1943).

27 |         [11] RLA § 2, Ninth (45 U.S.C. § 152, Ninth).

28 |         [12] *America West Airlines, Inc. v. Nat'l Mediation Bd.*, 986 F.2d 1252, 1256 (9th Cir. 1992).

1          However, the presence of a representation *issue* should not be mistaken as a representation

2 *dispute*.[13] In *AFLA v. Delta*, the court needed to determine whether the Association of Flight

3 Attendants was an RLA representative in order to impose defamation liability under an agency

4 theory. The D.C. Circuit held that this was not a representation dispute, and thus the district court

5 had jurisdiction to decide the defamation claim, even though the district court necessarily had to

6 determine whether the union represented the flight attendants. "To the extent Delta suggests that

7 every case that merely entails an issue of representation must be brought before the NMB, then,

8 that argument plainly proves too much."[14]

9          Likewise, the instant dispute requires that I determine whether AAPAG represented the

10 pilots for purposes of the RLA when the PWR was executed. But that determination is a far cry

11 from a full-fledged NMB certification. I am not granting any rights or imposing any duties on

12 AAPAG that an NMB certification would entail. Nor has AAPAG, which is apparently a defunct

13 entity, or anyone else petitioned that I certify AAPAG as an RLA representative.

14          Allegiant argues that the NMB's certification of the IBT as the pilots' bargaining

15 representative inhered a factual finding that AAPAG was *not* the pilots' former representative. It

16 is true that the NMB stated that the pilots were not previously represented, but that conclusion

17 was apparently based on faulty information provided by the IBT and not subsequently corrected

18 by the pilots, AAPAG, or Allegiant. Notably, the IBT did not yet represent the pilots when it

19 made those representations to the NMB and therefore those representations cannot be imputed to

20 the pilots. There is no indication that the NMB performed an independent investigation of

21 AAPAG's status or that anyone requested that the NMB do so.[15] Moreover, the NMB factual

22 finding that demands deference is the affirmative identification of a bargaining representative.[16] I

23

24            [13] *See Ass'n of Flight Attendants, AFL-CIO v. Delta Air Lines, Inc.*, 879 F.2d 906, 916 (D.C. Cir.

25 1989) [hereinafter *AFLA v. Delta*].

           [14] *Id.*

26
           [15] *Cf. Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 327 (1979) (collateral estoppel precludes

27 the relitigation of only those issues actually litigated in the prior suit).

           [16] *See Switchmen's*, 320 U.S. at 304; *America West*, 986 F.2d at 1256.

28

1    will not treat the NMB's seemingly misinformed remark that the pilots were not previously

2    represented as a conclusive determination that AAPAG was *not* the pilots' RLA representative.

3    In sum, this case does not constitute a "representation dispute."

4                    **2.    Major/Minor Disputes**

5            In *Association of Flight Attendants v. Mesa Air Group*, the Ninth Circuit explained the

6    distinction between so-called "major" and "minor" disputes under the RLA:

7            The RLA mandates a long process of negotiation and mediation before unions and
        common carriers are permitted to use their various economic weapons to pressure
8        the other side to reach an agreement. . . . The RLA provides two separate dispute
        resolution procedures that the parties to a labor negotiation can invoke during the
9        negotiation process. . . . One set of procedures applies to what are labeled "major
        disputes" between the parties. The other set applies to what are labeled "minor
10       disputes."[17]

11   Of crucial importance, federal district courts do not have subject matter jurisdiction to resolve

12   minor disputes, but they do have jurisdiction over major disputes.[18] The resolution of minor

13   disputes in the airline industry is solely within the province of an adjustment board established by

14   the airline and the unions.[19]

15           However, there are several exceptions to an adjustment board's exercise of sole

16   jurisdiction over minor disputes. Courts have jurisdiction to resolve a minor dispute if "1) the

17   employer repudiates the private grievance machinery; 2) resort to administrative remedies would

18   be *futile*; 3) the employer is joined in a DFR [duty of fair representation] claim against the union;

19   or 4) the union's DFR breach causes the employee to lose the right to present his or her

20   grievance."[20] Of these, only the second is relevant here. "A proceeding in arbitration is futile

21

22

23          [17] 567 F.3d 1043, 1047 (9th Cir. 2009).

24          [18] *Consolidated Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 303–04 (1989)
     [hereinafter *Conrail*].

25          [19] *Id.* at 303–04 n.4.

26          [20] *Miklavic v. USAir Inc.*, 21 F.3d 551, 554 (3d Cir. 1994) (emphasis added); *see also Dement v.
     Richmond, Fredericksburg & Potomac R.R. Co.*, 845 F.2d 451, 463 n.21 (4th Cir. 1988); *James v. Am.
27   Gen. Assurance Co.*, 816 F. Supp. 2d 471, 483 (E.D. Mich. 2011); *Kozy v. Wings W. Airline, Inc.*, No. C-
     94-1678, 1995 WL 32915 at *2–3 (N.D. Cal. Jan. 25, 1995).
28

1    only when, through bias, prejudice or predisposition *on the part of the arbitration board*, there

2    would be no point in submitting the claim to arbitration."[21]

3        The relevancy of distinguishing between major and minor disputes is not just to determine

4    the proper decision-maker. If a dispute is major, the parties are obligated to maintain the status

5    quo until the lengthy bargaining and mediation processes for major disputes are exhausted, and

6    courts may enjoin violations of the status quo.[22]  Courts have no such equitable power to address

7    minor disputes.[23]

8        The status quo includes all express and implied conditions in an existing agreement and,

9    under the Supreme Court's seminal *Shore Line* decision, "those actual, objective working

10   conditions and practices, broadly conceived, which were in effect prior to the time the pending

11   dispute arose and which are involved in or related to that dispute."[24]  The existence of an

12   agreement is a necessary predicate; the "actual, objective working conditions and practices" are

13   not protected unless there is a valid, binding agreement between the union and the carrier.[25]

14       The Supreme Court has since held that *Shore Line*'s "actual, objective" standard

15   "extended the relevant language of § 156 [RLA § 6] to its outer limits."[26]  However, the Court did

16   not overrule *Shore Line*.  Rather, it held that "operating a railroad through the agency of its

17   employees" did not fall within *Shore Line*'s formulation of the status quo, and, therefore, district

18   courts may not enjoin the sale of a rail company's assets as violative of the status quo where that

19   sale is part of the company's cessation of business.  In other words, the mere status of being

20   employed is not within the protected status quo.  *Pittsburgh* limited *Shore Line* in a precise

21   factual scenario; it did not restrain *Shore Line* beyond the facts presented in *Pittsburgh*.

22

23       [21] *Miklavic*, 551 F.3d at 555 (emphasis in original).

         [22] *Conrail*, 491 U.S. at 302–03.
24
         [23] *See id.* at 303.

25       [24] *Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union*, 396 U.S. 142, 153 (1969)
     [hereinafter *Shore Line*].
26
         [25] *Int'l Bhd. of Teamsters v. N. Am. Airlines*, 518 F.3d 1052, 1053 (9th Cir. 2008) (citing *Williams*
27   *v. Jacksonville Terminal Co.*, 315 U.S. 386, 402–03 (1942)).

28       [26] *Pittsburgh & Lake Erie R.R. Co. v. Ry. Labor Executives' Ass'n*, 491 U.S. 490, 506 (1989).

1    In addition, the status quo does not include actions within the carrier's management

2    prerogatives—"the class of decisions that are not decisions about rates of pay, rules or working

3    conditions[.]"[27]

4    A key issue then is whether the status quo violations about which the IBT is complaining

5    should be categorized as major or minor disputes. "Major disputes generally result from attempts

6    by labor or management to impose new obligations or create new rights. . . . Minor disputes, on

7    the other hand, generally result from attempts to enforce existing contractual obligations and

8    rights."[28]  "Minor disputes are not necessarily unimportant or insignificant. Indeed, minor

9    disputes can involve disagreements of great practical or economic significance."[29]  In *Conrail*, the

10   Supreme Court elaborated on the distinction between major and minor disputes:

11       "[Minor disputes] contemplate[] the existence of a collective agreement already
         concluded or, at any rate, a situation in which no effort is made to bring about a
12       formal change in terms or to create a new one. The dispute relates either to the
         meaning or proper application of a particular provision with reference to a specific
13       situation or to an omitted case. In the latter event the claim is founded upon some
         incident of the employment relation, or asserted one, independent of those covered
14       by the collective agreement, e.g., claims on account of personal injuries. In either
         case the claim is to rights accrued, not merely to have new ones created for the
15       future."[30]

16
     In *Mesa*, the Ninth Circuit synthesized the legal standard set forth in *Conrail*:
17

18       The distinction between major and minor disputes "looks to whether a claim has
         been made that the terms of an existing agreement either establish or refute the
19       presence of a right to take the disputed action. The distinguishing feature of such a
         case is that the dispute may be conclusively resolved by interpreting the existing
20       agreement." . . . When "an employer asserts a contractual right to take the
         contested action, the ensuing dispute is minor if the action is arguably justified by
21       the terms of the parties' [CBA]. Where, in contrast, the employer's claims are
         frivolous or obviously insubstantial, the dispute is major."[31]

22

23

24   [27] *Chicago & N.W. Transp. Co. v. Ry. Labor Executives' Ass'n*, 908 F.2d 144, 151 (7th Cir. 1990)
     (citing *Pittsburgh*, 491 U.S. at 506–07).
25
     [28] *Mesa*, 567 F.3d at 1047.
26
     [29] *Id.*
27   [30] 491 U.S. at 303 (quoting *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945)).

28   [31] *Mesa*, 567 F.3d at 1047 (quoting *Conrail*, 491 U.S. at 305, 307).

The party asserting that a dispute is minor has the burden of establishing that an action is "'arguably justified' by the terms of the CBA," although that burden is "'relatively light.'"[32] "When in doubt, courts construe disputes as minor."[33] Here, the burden is on Allegiant.

Thus, the relevant questions are whether Allegiant's changes to the pilots' working conditions were arguably justified by the terms of the PWR. First, however, I must determine whether there is an agreement which establishes the status quo.

### a. Existence of an Agreement and AAPAG's Representative Status

The RLA does not precisely define the term "agreement."[34] Nonetheless, the RLA gives a strong indication of what constitutes an agreement. RLA § 2, First (45 U.S.C. § 152, First) provides that "[i]t shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions . . . ." Likewise, RLA § 6 (45 U.S.C. § 156) mandates that written notice must be provided of intended changes in "agreements affecting rates of pay, rules, or working conditions." Whether or not an "agreement" must contain all three—rates of pay, rules, and working conditions—is unclear, but a contract that does contain all three, such as the PWR, qualifies as an agreement for RLA purposes. In addition, as a type of contract, an RLA agreement must have been properly formed under contract law.[35]

---

[32] *Id.* (quoting *Conrail*, 491 U.S. at 307).

[33] *Id.*

[34] *See* RLA § 1 (45 U.S.C. § 151).

[35] *See Goclowski v. Penn Cent. Transp. Co.*, 571 F.2d 747, 756 (3d Cir. 1977); *E. Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 670 F. Supp. 947, 951 (S.D. Fla. 1987) (collecting circuit court cases), *aff'd*, 861 F.2d 1546 (11th Cir. 1988) ("The ordinary common law of contracts applies to the formation of a contract even in the context of a collective bargaining agreement governed by the RLA.").

1    The relevant formation issue here is whether AAPAG represented the pilots such that

2    AAPAG's negotiation of the PWR, its president's signature on the document, and the pilots' later

3    ratification of the PWR (through a vote organized by AAPAG), served to bind the pilots.[36]

4    The RLA defines the term "representative" as "any person or persons, labor union,

5    organization, or corporation designated either by a carrier or group of carriers or by its or their

6    employees, to act for it or them."[37]  This requirement is quite simple, and "[t]here are no

7    qualifiers attached to the Act's simple definition of 'representative.'  The 'representative of a craft

8    of employees is, simply, a person or union designated to act on their behalf, to accomplish what

9    they seek to accomplish, and is not necessarily a man for all seasons."[38]  "The majority of any

10   craft or class of employees shall have the right to determine who shall be the representative of the

11   craft or class for the purposes of [the RLA]."[39]

12   Under this definition, AAPAG was the pilots' representative.  The pilots voted to create

13   AAPAG.  The preamble to AAPAG's Constitution and Bylaws states that the Constitution and

14   Bylaws "provide[] the mechanism through which all member pilots are represented both

15   individually and collectively."[40]  One of AAPAG's objectives, as stated in its Constitution and

16   Bylaws, is "to make, determine, negotiate, maintain and/or improve employment agreements

17   covering rates of compensation, hours of employment, work rules, benefits and working

18   conditions for the members of the Association."[41]  This language certainly indicates that the pilots

19   designated AAPAG to act for them.[42]  On Allegiant's side, the Chief Executive Officer ("CEO"),

20   Maury Gallagher, stated in an open letter dated December 17, 2009 to Allegiant's pilots that

---

[36] *See Great Am. Ins. Co. v. Gen. Builders, Inc.*, 934 P.2d 257, 261 (Nev. 1997) (an agent acting within the scope of her authority has the power to contractually bind her principal).

[37] RLA § 1, Sixth (45 U.S.C. § 151, Sixth).

[38] *Russell v. Nat'l Mediation Bd.*, 714 F.2d 1332, 1341 (5th Cir. 1983).

[39] RLA § 2, Fourth (45 U.S.C. § 152, Fourth).

[40] (AAPAG Constitution & Bylaws at 6, Dkt. No. 51-4 at 15.)

[41] (*Id.* at 9, Dkt. No. 51-4 at 18.)

[42] *See* RLA § 1, Sixth (45 U.S.C. § 151, Sixth).

1  "Management has a history of compromise with AAPAG" and that "Allegiant pilots have made

2  significant gains in every new contract since 2001," indicating that at least the CEO believed that

3  Allegiant and AAPAG had formed binding contracts for the pilots.[43] Most importantly, the PWR,

4  which was executed by Allegiant's Vice President of Flight Operations, recognizes AAPAG as

5  "the elected and representative body of the pilot group of Allegiant Air."[44]

6      Allegiant raises several arguments to the contrary, none of which is availing. First,

7  Allegiant points to various statements made by the IBT, before it was certified as the pilots'

8  bargaining representative, that the pilots had no representative and that there was no RLA

9  agreement. But IBT did not yet represent the pilots at that time and therefore its statements

10  cannot be imputed to them. And to the extent IBT made any post-certification statements

11  concerning AAPAG's pre-certification status, IBT was not present during AAPAG's creation or

12  during the years of AAPAG's relationship with Allegiant. It is thus dubious that IBT had

13  sufficient information to determine whether AAPAG was the pilots' RLA representative, nor

14  could IBT's statements serve to retroactively revoke AAPAG's prior representative status.

15      The same logic applies to the IBT's application for NMB certification, which failed to

16  indicate that AAPAG was the pilots' representative or that the pilots had an extant agreement.

17  This application was obviously prepared before the IBT was certified. That no one corrected the

18  IBT's on-site posting of the NMB application is of little moment, as it is unclear how many

19  people saw or read the posting, and the presumptive focus of those who did read it would have

20  been to make sure that the IBT was acting properly to become certified rather than whether the

21  IBT had misstated AAPAG's status.

22      Second, Allegiant points to several statements in a union organizing pamphlet sent by

23  AAPAG to the pilots in March 2012:

24      "One big problem for us as an independent union without a current contract . . .

25      "[U]ntil we get our first contract, . . .

26

27  [43] (Gallagher Dec. 17, 2009 Letter, Dkt. No. 59-2 at 3–4.)

28  [44] (PWR at 6, Dkt. No. 51-5 at 13.)

"One option for getting dues right away would be to ask the company to lock in our current work rules into a contract . . .

"Strong unions have strong contracts that can be an inch thick. We don't want a legal version of our 40 page work rules . . . ."[45]

These statements indicate AAPAG's apparent subjective belief that the PWR was not a binding agreement. However, the parties' subjective characterization of a document is not dispositive.[46] Also, it would be unreasonable to conclude that these statements by AAPAG served to repudiate the PWR such that is was no longer binding after March 2012.

Third, Allegiant contends that its dealings with AAPAG did not convert AAPAG from a non-representative employee advocacy group into an RLA representative—that Allegiant never *voluntarily* recognized AAPAG as the pilots' representative. This argument conveniently ignores that Allegiant did precisely that in the PWR, by recognizing AAPAG as "the elected and representative body of the pilot group of Allegiant Air."[47]

Fourth, Allegiant points to the following statement in the PWR as precluding any interpretation of the PWR as a contract: "Nothing contained in these Work Rules should be interpreted as giving rise to a contract or a promise of employment for any period of time."[48] This disclaimer is best understood, however, as an attempt to preclude reliance on the PWR as establishing a contract of employment.[49] In other words, Allegiant wanted its pilots to remain as at-will employees rather than become contract employees by dint of the PWR, presumably to

---

[45] ("AAPAG Union" Pamphlet, Dkt. No. 56 at 17–19.)

[46] *See Don-Rick, Inc. v. QBE Americas*, __ F. Supp. 2d __, at 2014 WL 359664 at *3 (W.D. Wis. Feb. 3, 2014) ("Wisconsin long has held that parties' characterizations or labels of a document are not controlling."); *Joyce v. Pecos Benedictine Monastery*, 895 P.2d 286, 289 (N.M. App. Ct. 1995) ("[T]he parties' characterization of the relationship will not be dispositive on the issue of whether a contract of employment existed.").

[47] (PWR at 6, Dkt. No. 51-5 at 13.)

[48] (*Id.*)

[49] *See Sw. Gas Corp. v. Vargas*, 901 P.2d 693, 696–97 (Nev. 1995).

1  avoid wrongful discharge lawsuits for firings without cause.  The use of this type of disclaimer in

2  employment contracts is not uncommon.[50]

3       Finally, Allegiant asserts that AAPAG never complied with the formalities required of

4  "labor organizations" under the Labor-Management Reporting and Disclosure Act ("LMRDA").[51]

5  But even if AAPAG were a labor organization as defined by the LMRDA and it violated the

6  LMRDA—issues I need not reach—failure to comply with the LMRDA is punished with fines

7  and imprisonment, not the loss of representative status or the voiding of agreements.[52]  Whether

8  AAPAG complied with the LMRDA is thus irrelevant as to whether it was the pilots'

9  representative for purposes of negotiating the PWR.

10       In sum, AAPAG was the pilots' representative when the PWR was negotiated and

11  executed.  The PWR was properly formed and concerns "rates of pay, rules, and working

12  conditions," rendering it an "agreement" under the RLA.  The PWR, along with the actual,

13  objective working conditions that existed at the time of the IBT's RLA § 6 notice, established the

14  status quo that both the IBT and Allegiant must respect for the duration of the ongoing collective

15  bargaining negotiations.

16       I now turn to whether each of the challenged alterations in work conditions is a minor or

17  major dispute.

18

19               **b.**     **Eliminating Pay Protections for Pilots Engaged in Negotiations for a New Collective Bargaining Agreement**

20

21       In relevant part, the "Trip Adjustments" section of the PWR provides that pilots "engaged

22  in official company business" will be "removed from any previously assigned duty for each day

23

24

---

25     [50] *See id.*; Michael J. Phillips, *Disclaimers of Wrongful Discharge Liability: Time for a

26  Crackdown?*, 70 WASH. U. L.Q. 1131 (1992); Michael A. Chagares, *Utilization of the Disclaimer as an Effective Means to Define the Employment Relationship*, 17 HOFSTRA L. REV. 365 (1989).

27     [51] 29 U.S.C. §§ 401–531.

28     [52] *Id.* § 439.

1   engaged in Company Business" and that "any trip(s) will be . . . pay protected."[53]  The PWR does

2   not define "company business," and thus Allegiant's argument that "company business" does not

3   include pilot participation in collective bargaining sessions is arguably justified.  Therefore, this is

4   a minor dispute beyond my jurisdiction.[54]  To the extent the IBT seeks to rely on past practice to

5   interpret the scope of "company business," that interpretive task does not convert the issue from a

6   minor dispute to a major dispute.[55]

7          With regard to minor disputes such as this one, the next question is who is to resolve such

8   disputes.  The PWR's so-called "Open Door Policy" provides that unresolved disputes are to be

9   appealed to Allegiant's Vice President of Flight Operations, then to the Senior Vice President of

10  Operations, and finally to the Chairman.  *See* Plaintiff's Exhibit #1 at p. 48.  However, the

11  evidence presented at the hearing clearly demonstrated that such an effort would be futile.

12  *Transport Workers Union v. American Airlines, Inc.*, 413 F.2d 746, 751 (10th Cir. 1969).

13  Captain Baden and Mr. Gallagher both testified that they see no merit in the pilots' claims, and

14  that they both were involved in and/or ratified the decisions that are the subject of this lawsuit.

15  Thus, resort to the PWR's Open Door Policy for resolution of this minor dispute is excused.

16  Moreover, the IBT contends that I must mandate the use of a board of adjustment because such

17  boards are required under 45 U.S.C. § 184 regardless of what the PWR says. (Dkt. #76 at p. 7,

18  ftnt. 5.)  Without resolving whether I am required to order the use of a board of adjustment, I find

19  that such a board is the most efficient way to resolve this and other minor disputes, given that the

20  Open Door Policy is futile.  As set forth below, I will order the parties to confer about the creation

21  of such a board and to submit supplemental briefs on this issue.

22

23

24

25
_____

26        [53] (PWR at 37, Dkt. No. 51-5 at 44.)

          [54] *See Mesa*, 567 F.3d at 1047.

27        [55] *See Chicago & N.W.*, 908 F.2d at 157; *Bhd. Ry. Carmen of U.S. & Canada, AFL-CIO-CLC v.*
28  *Norfolk & Western Ry. Co.*, 745 F.2d 370, 377 (6th Cir. 1984) ["*Carmen*"].

1

        **c.**    **Changing Leave of Absence Provisions for Birth or Adoption**

2          In pertinent part, the "Parental Leave" section of the PWR provides that "[p]arents are

3    eligible to receive up to 5 *working* days after the birth/adoption of a child."[56] The prior version of

4    the Pilot Work Rules, executed in 2009, had a different rule, whereby "[p]arents [were] eligible to

5    receive up to 5 *consecutive* days after the birth/adoption of a child." Allegiant recently changed

6    this rule by imposing the old rule of granting up to five *consecutive* instead of five *working* days,

7    stating that the "up to" language means that the pilots may be afforded less than five days, and

8    requiring that these days be taken immediately after the birth/adoption. These changes are not

9    arguably justified by the terms of the PWR. The "consecutive v. working days" change is a

10    unilateral rewrite of the current rule back to the old rule. Nothing in the PWR mandates when

11    those days must be taken. And although the PWR provides for "up to" five days off, that cannot

12    reasonably be interpreted to mean that Allegiant has the sole discretion to provide between zero

13    and five days at its whim. If so, the parental leave provision would be essentially meaningless.

14    Allegiant voluntarily abandoned the old rule and bargained for the new one. Its reversion to the

15    old rule amounts to the assertion of a new right rather than a right that can arguably be inferred

16    from the PWR. Therefore, this is a major dispute.[57]

17

18        **d.**    **Alteration of Loss-of-Medical-Certificate Program for Pilots Who Become Ill or Disabled**

19

20          The "Loss of Medical Certificate" section of the PWR provides that "[i]f a Pilot loses the

21    ability to fly due to loss of his/her Medical Certificate . . . , the Pilot will not suffer loss of

22    employment or reduction in base pay," and that "an employment opportunity will be made

23    available in the area best suited to the individual's talents and expertise. If the Pilot does not

24    accept the employment opportunity, or he/she is unable to satisfactorily perform the duties

25

26

27       [56] (PWR at 44, Dkt. No. 51-5 at 51 (emphasis added).)

28       [57] *See Mesa*, 567 F.3d at 1047.

1   assigned, he/she will forfeit the pay guarantee under this provision."[58] The IBT asserts also that

2   Allegiant previously established a practice of allowing pilots to perform "light-duty" work at

3   home or near their base airports, and that Allegiant is violating the PWR and this established

4   practice by now forcing non-medically cleared pilots to travel to Las Vegas for light duty work at

5   their own expense. Allegiant argues that nothing in the PWR limits the term "employment

6   opportunity" to jobs in Las Vegas.

7          Allegiant is correct inasmuch that the type of job that qualifies as an "employment

8   opportunity" is a matter of contract interpretation and thus a minor dispute. However, the issue

9   here is whether compelling the pilots to pay for their travel to Las Vegas is arguably justified by

10  the PWR. It is not. As discussed above, the PWR obligates Allegiant to pay travel costs for

11  company business. Traveling to accept and perform a company employment opportunity is

12  undisputedly company business. Forcing pilots to pay for their own travel is not arguably

13  justified by the express terms of the PWR. Accordingly, this is a major dispute.

14

15                      e.      **Shifting from Line Bidding to Preferential Bidding for Pilot
                                Schedules**

16

17         Allegiant's unilateral election to use a preferential bidding system ("PBS") in lieu of line

18  bidding is not arguably justified by the terms of the PWR, as the use of a PBS directly conflicts

19  with the PWR's mandated use of line bidding. The "Scheduling" section of the PWR provides, in

20  relevant part:

21         **Trips and Bid Lines.** The Company will build Trips and Bid Lines and they will
           be available for bid and awarded by Seniority. Trips and lines will be generated
22         with the advice and assistance of the Pilot Scheduling Committee.

23         * * *

24         **Pilot Scheduling Committee.** The Company will work with Pilots interested in
           helping the Company construct monthly Regular Lines of Time and Reserve Lines
25

26

27         _____

28         [58] (PWR at 45, Dkt. No. 51-5 at 52.)

of Time as well as the Trips associated with the Lines of Time at the respective Domiciles.[59]

Even if Allegiant's new Merlot PBS system sufficiently respects pilot seniority, the use of a PBS is "in nowise contemplated" or arguably justified by the PWR.[60]  Consequently, this is a major dispute.

To summarize, all of the present disputes are major except for one.  The dispute about whether "company business" includes pilot time spent negotiating for a new collective bargaining agreement is minor.  I therefore have jurisdiction to enjoin the status quo violations which amount to major disputes.

## B.    Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."[61]  The Supreme Court elaborated on courts' duties in equity:

> A preliminary injunction is an extraordinary remedy never awarded as of right. . . . In each case, the courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. . . . In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.[62]

The parties dispute whether *Conrail*'s statement, apparently in dicta, that courts may enjoin violations of the status quo without the "customary showing of irreparable injury" remains binding law in light of *Winter*.[63]  But I need not reach that precise issue because the IBT has sufficiently established irreparable injury, as explained below.

---

[59] (PWR at 21, Dkt No. 51-5 at 28.)

[60] *O'Donnell v. Wien Air Alaska*, 551 F.2d 1141, 1147 (9th Cir. 1977); *see Mesa*, 567 F.3d at 1047.

[61] *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).

[62] *Id.* at 24 (internal quotation marks and citations omitted).

[63] *Conrail*, 491 U.S. at 303.

1
### 1. Likelihood of Success on the Merits

2      The IBT has established a likelihood of success on its RLA claims and its breach of

3 contract claim. Because the IBT was the pilots' representative and the PWR is an agreement

4 under the RLA, the IBT probably will prevail on at least some of its claims that Allegiant has

5 violated the status quo, which in turn would amount to a breach of the PWR.

6
### 2. Irreparable Harm

7      Irreparable harm is established if the "remedies available at law, such as monetary

8 damages, are inadequate to compensate for the injury."[64] In the collective bargaining context,

9 irreparable harm can be established if the union's bargaining position is sufficiently

10 compromised. "'Unilateral changes made while the employees' representative is seeking to

11 bargain . . . interfere with the normal course of negotiations by weakening the union's bargaining

12 position.'"[65] The National Labor Relations Board has expressed nearly identical concerns, which,

13 although made in the context of bargaining under the National Labor Relations Act, are

14 applicable to this case in that the IBT is newly-certified and engaging in its first negotiation with

15 Allegiant:

16      Undermining of Bargaining Representative[:]

17      [These] cases involve a variety of employer unfair labor practices designed to
       undermine employee support for an incumbent or newly certified union . . . .
18      [T]he employer has not literally withdrawn recognition from the union but has
       taken *action which belittles the union in the eyes of employees and impairs the*
19      *union's authority to effectively represent employees.* The violations can include
       threats . . . or implementing important changes in working conditions either
20      discriminatorily or without bargaining with the union. The need for [injunctive]
       relief is to prevent the predictable, irreparable erosion of employee support for the
21      incumbent union.[66]

22

23

24      [64] *Herb Reed Enters., LLC v. Fl. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013).

25      [65] *Int'l Ass'n of Machinists & Aerospace Workers v. Transportes Aereos Mercantiles Pan
       Americandos, S.A.*, 924 F.2d 1005, 1008 (11th Cir. 1991) (quoting Archibald Cox, *The Duty to Bargain in*
26      *Good Faith*, 71 HARV. L. REV. 1401, 1423 (1958)).

27      [66] NAT'L LABOR RELATIONS BD., SECTION 10(J) MANUAL USER'S GUIDE (2002) (emphasis
       added), *available at* http://www.nlrb.gov/sites/default/files/attachments/basic-page/node-
28      1727/redacted_10j_manual_5.0_reduced.pdf.

1   All of the IBT's alleged status quo violations raise this precise concern over undermining

2   the IBT's authority to effectively represent the pilots in the ongoing negotiations.  The IBT's

3   bargaining position is substantively weakened when the floor from which the IBT must negotiate

4   upward is lowered by Allegiant's unilateral changes in working conditions.

5   In addition, having less time to bond with a newly-arrived child cannot be fully

6   compensated with money.  Likewise, the disruption caused and time lost by relocating to Las

7   Vegas for light-work duty cannot be fully compensated with money.  Forced travel at the pilots'

8   expense deprives the pilot not just of money but of family stability and personal well-being.

9   Finally, the new PBS scheduling system is apparently causing many single days off and a lack of

10  predictability, which wreak some level of havoc in the pilots' lives.  Back pay and/or damages are

11  insufficient to remedy this harm.  The IBT has established a likelihood of irreparable injury.

12          **3.      Balancing of the Equities**

13  Each side's hardships vary for each part of the requested relief, and must be addressed

14  separately.  As to the parental leave provision, Allegiant's harm seems predominantly monetary,

15  with some possible scheduling challenges arising from pilots requesting days off weeks or months

16  after the arrival of a new child (a practice allowed under the PWR).  The value of bonding with a

17  new child outweighs the harm to Allegiant, and, therefore, a return to the status quo is warranted

18  as to this violation.

19  For the forced travel to Las Vegas at the pilots' expense, Allegiant's harm is solely

20  monetary while the pilots are suffering harm to family stability and personal well-being.  The

21  equities tip in favor of restoring the status quo as to this working condition.

22  Concerning pilot scheduling, the equities are strong on both sides.  The pilots claim to be

23  in a position of uncertainty and unpredictability with their schedules.  They feel powerless to

24  choose or design a schedule of their liking, and they are at the whim of an alleged "black box"

25  system which Allegiant claims respects seniority but which the pilots view as opaque and

26  unpredictable.  I disagree with some of the pilots' assertions here.  It appears that the pilots will

27  gain more certainty and predictability as they gain experience with the PBS system.  The certainty

28

1    and predictability will not be absolute, but it was not absolute for all pilots before the Merlot

2    system was adopted, and we do not live in a perfect world (nor does equity require perfection).

3           On the other hand, Allegiant must now comply with FAA Part 117, which governs pilot

4    scheduling and rest times.  It appears that a return to the line bidding system mandated by the

5    PWR would cause major disruptions to Allegiant's flight operations because that system was

6    designed before Part 117 went into effect.  The IBT is entitled to a limited injunction regarding

7    pilot scheduling, but I will not order a wholesale return to line bidding under the PWR.

8           A narrowly tailored injunction is therefore appropriate which will address the IBT's

9    concerns about seniority, participation in the scheduling process, transparency, and predictability,

10   and also will provide Allegiant with sufficient flexibility to employ and modify the PBS system

11   to reasonably accommodate the IBT's concerns.

12                   **4.     Public Interest**

13          The public interest also cuts both ways.  The public has an interest in Allegiant's

14   continued operations as a common carrier.  Indeed, the underlying thrust of the RLA is to keep

15   common carriers in business during labor disputes and to avoid resort to self-help measures such

16   as strikes and lockouts, so as to "eliminat[] interruptions to interstate commerce."[67]  On the other

17   hand, the public also has in interest in "effective collective bargaining"[68] to "maintain industrial

18   peace."[69]  These competing interests weigh in favor of a narrowly tailored injunction, especially

19   as to pilot scheduling and possible impacts on Allegiant's flight operations.

20

21   **III.   CONCLUSION**

22

23          In accord with the above and Rule 65, the parties are hereby enjoined as follows:

24

25          [67] *Aircraft Serv. Int'l Inc. v. Int'l Bhd. of Teamsters AFL CIO Local 117*, 742 F.3d 1110, 1121 (9th
26   Cir. 2014).

             [68] *U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 491 (1994).

27          [69] *Van Bourg, Allen, Weinberg & Roger for & on Behalf of Carpet, Linoleum, & Soft Tile Workers
28   Union, Local 1288 v. N.L.R.B.*, 728 F.2d 1270, 1273 (9th Cir. 1984).

1.  The parties shall confer about the establishment of a board of adjustment in accord with the Railway Labor Act to resolve the minor dispute concerning the proper interpretation of "company business."  Within 30 days of entry of this Order, the parties shall submit a joint brief or separate briefs outlining their agreement or respective proposals for the creation of such a board.

2.  **Parental Leave.**  Allegiant shall comply with the "Parental Leave" section of the PWR (PWR page 44, Section 6 – "Leaves of Absence").[70]  Specifically, pilots shall have five "working" (rather than "calendar") days off for such an event.

3.  **Loss-of-Medical-Certificate Program ("Light-Duty" Work).**  Allegiant shall reinstate the Loss-of-Medical-Certificate program, in accord with the PWR.  Specifically, Allegiant shall allow pilots who lose their medical certification to perform light work duty at their homes or near their base airports whenever practical—rather than mandating that they always perform light duty work in Las Vegas, Nevada—in accord with the PWR.  If pilots are required to travel to Las Vegas for such work, or to another location that would require out-of-pocket travel costs, it shall be at the company's expense.[71]  Allegiant is obligated to cover these costs as "company expenses" under the "Trip Adjustments" section of the PWR (PWR page 37, Trip Adjustments, Pilots Engaged in Official Company Business).[72]

4.  **Pilot Scheduling.**  Allegiant shall modify its current Merlot pilot scheduling system to better respect pilot seniority and to provide greater transparency and

---

[70] (PWR at 44, Dkt. No. 51-5 at 51.)

[71] (PWR at 45, Dkt. No. 51-5 at 52.)

[72] (PWR at 37, Dkt. No. 51-5 at 44.)

predictability for the pilots. Allegiant shall make those modifications within 90 days of the date of this Order. In the meantime, Allegiant may continue to use the current version of Merlot. The parties shall submit status reports every 30 days on the progress of these modifications. The failure of either side to act in good faith likely will result in sanctions. At oral argument on the scope of the injunction, the parties agreed that the following points would guide their discussions:

A.   Continuing the process of educating pilots regarding the bidding process in Merlot through additional Merlot Crew Days, identification of specific Allegiant personnel whom pilots could contact with bidding questions, establishment of a process by which answers to crewmembers' questions are distributed to the entire pilot group. To the extent feasible, Allegiant should seek the direct participation of Merlot representatives in the educational process.

B.   Establishing a means by which pilots could be provided with one-on-one assistance with the bidding process (e.g., a "help desk").

C.   Establishing a "standing bid" process by which a pilot would have a "default" bid which would be used for every subsequent month unless changed by the pilot (thus avoiding the risk that the pilot would be deemed not to have a bid at all and therefore be treated as an apathetic bidder).

D.   Exploring the technological and operational feasibility of increasing the number and type of bid preferences available under Merlot.

E.      Developing Merlot applications compatible with tablets and smart phones.

F.      Enhancing the pilots' ability to trade trips with each other, thereby allowing them to adjust their schedule more easily after lines are awarded.

G.      Establishing a process by which pilots can obtain a meaningful explanation regarding why they did not receive their stated preference on a particular day.

H.      Investigating the feasibility of allowing pilots to view (or even bid) two months in advance.

DATED this 22nd day of July, 2014.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE